UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Case No. 20-CR-0019 (PJS/BRT)

        Plaintiff,

v.                                                                     MEMORANDUM

DARNELL DESHAWN STENNIS,

        Defendant.

---

Joseph H. Thompson and Manda M. Sertich, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Daniel L. Gerdts, for defendant.

Defendant Darnell Stennis was charged with several crimes in connection with his sex trafficking of women.  At trial, Stennis admitted that he recruited women to work as prostitutes, posted advertisements for their services, and took the money they earned.  But Stennis denied that he had *forced* anyone to engage in acts of prostitution.

The jury concluded otherwise.  Stennis was convicted in October 2021 of two counts of sex trafficking by force, fraud, or coercion;[1] two counts of interstate

---

[1] 18 U.S.C. §§ 1591(a), (b)(1); 1594(a).

transportation of a person to engage in prostitution;[2] and one count of obstructing the enforcement of the federal law against sex trafficking.[3]  ECF No. 157.

At trial, Stennis moved for a judgment of acquittal under Fed. R. Crim. P. 29(a). The Court reserved decision on the motion and later, at Stennis's sentencing hearing, denied the motion.  This memorandum describes the reasons for the Court's decision.

## I.  BACKGROUND

### A.  *Stennis Meets A.R.*

By his telling, Stennis first began pimping around 2014, after serving a prison term in California.  He met a woman, slightly older than he, who introduced him to the "game" (as he calls it).  He spent a couple months in Sacramento acting as her pimp before they parted ways.  He pimped other women in the San Francisco Bay area until about 2016, when homesickness led him to return to Illinois.  There, he was arrested for illegal possession of firearms, and he served time on that charge—and then he served more time for a probation violation.  He was released from custody in late 2018.

After (very) briefly holding a legitimate job, Stennis returned to pimping.  To recruit women, he would message them on Facebook.  In early January 2019, he introduced himself to A.R. through that platform, and the two met in person shortly

---

[2]18 U.S.C. § 2421(a).  This offense is called a Mann Act violation.  *See, e.g.*, *Batsell v. United States*, 217 F.2d 257, 259 (8th Cir. 1954).

[3]18 U.S.C. § 1591(d).

thereafter.  (Both lived in Peoria, Illinois.)  According to Stennis, A.R. was at first just

interested in dating him.  But, by the end of January, the two were in a pimp-prostitute

relationship.

### B.   The Westlake Arrest

Stennis and A.R. rented a car and started traveling around the Midwest so that

A.R. could engage in sex work in various cities, including St. Louis, Missouri; Kansas

City, Missouri; Memphis, Tennessee; and eventually Independence, Ohio.  On

February 5, 2019, after their rental car broke down, Stennis and A.R. boarded a

Megabus passenger bus to Chicago.  Stennis testified that they intended to take another

bus from Chicago back to Peoria.[4]

While on the Megabus, A.R. sent her mother (who lived in Peoria) an alarming

text message[5] from a different phone number than A.R. usually used.  A.R.'s mother

---

[4]Up to this point, the Court has relied on Stennis's testimony for background. From here on, the facts recited will be based on the evidence that the government presented in its case-in-chief.  That is the only evidence on which the Court may rely in ruling on Stennis's Rule 29 motion.  *See* Fed. R. Crim. P. 29(b).

[5]The Court ruled that the contents of A.R.'s text message—that Stennis was holding her against her will on the Megabus—were inadmissible hearsay.  *See* ECF No. 177 at 39.  The Court also ruled, however, that law-enforcement witnesses could testify that they had received a report "that there was a woman being held against her will on the bus."  ECF No. 179 at 4–6.  That testimony was admitted not to prove the truth of the report (*i.e.*, that A.R. was in fact held against her will on a bus) but to provide context (*i.e.*, to explain why law enforcement took the actions about which the jury heard).

went to the Peoria Police Department and showed Sergeant Brock Lavin the message. Lavin called the number from which the message had been sent.  A man answered. After Lavin asked for A.R., the man claimed not to know A.R. and hung up.  A few moments later, A.R.'s mother's phone rang, with A.R. on the line.  After Lavin spoke with A.R., A.R. handed the phone to the bus driver, and Lavin told the bus driver to pull over and wait for police to arrive.

The bus driver pulled over in Westlake, Ohio, and the bus company's safety director called police to the scene.  After boarding the bus, police arrested Stennis and found A.R.'s driver's license in his pocket.  While being driven to jail for booking, Stennis spontaneously asked an officer if A.R. had said that Stennis was her pimp. Stennis later commented to the officer about the shutdown of Backpage, a website Stennis had used to post advertisements for prostitutes.  Stennis also told the officer that he owned three Facebook accounts.  Police matched Stennis's phone—the one A.R. had used to text her mother—to a phone number listed in several online advertisements for prostitution in St. Louis; Decatur, Illinois; Memphis; and Cleveland, Ohio (near Westlake).  Those ads had been posted during the nine days preceding Stennis's arrest at Westlake.

Westlake police eventually referred the case to Cuyahoga County's human-trafficking task force.  That task force, in coordination with the Department of Homeland Security, began investigating Stennis for sex trafficking.

### C.  A.J. Joins for a Road Trip to Minot

Soon after Stennis was released from custody in Ohio, he reunited with A.R., and the two made their way to Minnesota so that A.R. could engage in sex work.  In March 2019, Stennis started exchanging text messages with A.J., a prostitute who advertised on MegaPersonals (a website used by pimps and prostitutes to advertise commercial sex).  A.J. lived near Minneapolis.  She had been working as a prostitute for some time, and she was looking for a pimp.  Stennis arranged a meeting with A.J. and brought along A.R., who had a black eye.  Stennis and A.J. agreed that Stennis would act as her pimp.

After a failed attempt by Stennis and A.J. to find customers on the streets of Minneapolis, Stennis took A.J. and A.R. to Minot, North Dakota, to engage in sex work.  A.R. was upset, as she wanted to go home to Peoria.  But Stennis did not allow A.R. to return home.

On the drive to Minot, Stennis told A.R. and A.J. to post advertisements for themselves on commercial-sex websites.  When A.J.'s advertisements did not create

sufficient interest, Stennis took her phone and reworked her postings to make them "eye-catching."  ECF No. 179 at 235.[6]

Arriving in Minot, the three checked into a hotel room, and A.R. and A.J. started arranging "dates."  Stennis sometimes took their phones and replied to inquiries as though he were A.R. or A.J.  Stennis also set the prices for the women's services. Because the trio rented only a single room, if one woman was seeing a customer in the room, Stennis and the other woman would wait outside in the car.  After completing a "date," A.R. or A.J. would let the customer out the side door, let Stennis and the other woman in through the same door, and give Stennis the money.

That Stennis was entitled to all of the women's money was one of many "rules" that he imposed.  A.J. obeyed Stennis's rules without resistance, but A.R. was "kind of belligerent" (as A.J. testified), and Stennis sometimes enforced his rules against A.R. "physically."  *Id.* at 257.  Another of Stennis's rules was that his prostitutes should not spend too much time with a client.  A.R. violated that rule in Minot.  She spent too much time with a client, refused to answer Stennis's and A.J.'s calls, and even refused to answer when they knocked on the door of the room.  When A.R. finally came out of the

---

[6]When citing documents by ECF number, the Court cites the page numbers generated by the Court's electronic docketing system rather than the document's internal pagination.

room, she looked like she'd "had fun" during her "date."  ECF No. 180 at 16–17.

(Having fun with a customer was also against Stennis's rules.)

Stennis got upset.  He and A.R. started arguing—so loudly that hotel guests

called the lobby to complain.  Further, a hotel employee testified that, when Stennis and

A.R. walked through the lobby, A.R. screamed that Stennis had spit on her.  The hotel

employee called the police, and Stennis and A.R. fled to a nearby Walmart so police

could not find them.

### D.  Bloomington

Stennis, A.R., and A.J. left Minot early the next morning (March 24, 2019) and

headed back to Minnesota.  A.R. sat in the back seat, crying.  She wanted to go home to

Peoria, but Stennis insisted that she work another night, this time in Minnesota.  Stennis

and A.J. posted an advertisement online, and the three checked into a La Quinta hotel in

Bloomington, Minnesota, early in the morning of March 25.  A.R., still unhappy, refused

to work.  She stayed at the hotel while Stennis took A.J. out to walk the streets.  After

Stennis and A.J. returned, A.R. went into the bathroom, locked the door, and called a

man on her phone.  Based on what she overheard, A.J. thought that the man "sounded

like another pimp" and that "the conversation sounded like maybe [A.R.] was trying to

switch over or something."  ECF No. 180 at 32.

Talking to other pimps was a major violation of Stennis's rules.  Stennis tried to force his way into the bathroom, and he eventually got in (although it is not clear if he forced the door open or if A.R. opened it herself).  Stennis and A.R. started fighting, and A.J. could hear A.R. screaming, telling Stennis to stop.  When A.R. finally emerged from the bathroom, she had fresh injuries, including a second black eye.

A guest in the hotel reported sounds of yelling and someone being thrown against a wall to the hotel manager, who called the Bloomington police.  A separate 911 call was placed from a cell phone in the area of the hotel, but the dispatcher heard no one talking on the line—only "background noise that sounded like a struggle."  ECF No. 179 at 149.

Bloomington Police Officer David Mast, the first to arrive at the La Quinta, went to the 17th floor, from which the noise complaint had originated.  There, he encountered Stennis and A.J. in the hallway.  Once other officers arrived, they stayed with Stennis and A.J. while Mast went into their room.  The room was in disarray; items had been thrown around the bedroom and bathroom, the towel rack in the bathroom was bent, and the toilet lid was broken into multiple pieces.

A.R. entered the room.  A.R. was upset and crying, and she had a large black eye.  She told Mast that Stennis assaulted her after she told him that she did not want to continue to work as a prostitute for him.  According to A.R., Stennis shoved her around

the room and bathroom, eventually pinning her against the wall and squeezing his hand around her throat.  A.R. said she tried to fight Stennis off but that he "bashed" her head into the towel rack on the wall and pushed her down onto the toilet with sufficient force to break the lid.  *Id.* at 171.

Stennis was arrested.  Before Stennis was taken into custody, he gave his cell phone to A.J.  Stennis also directed A.J. not to tell the police that it was "a pimping situation."  Instead, A.J. was to say that she and A.R. were Stennis's girlfriends and that A.R. was upset because "[A.R.] was supposed to be the main girlfriend and she didn't want to have a threesome."  ECF No. 180 at 35.  Stennis also told A.J. to delete everything on his cell phone that related to prostitution "[j]ust in case the police got ahold of it," *id.* at 37, to change the phone's number, to continue to lie to the police, and to tell A.R. not to press charges.

### E.  Stennis's Phone Calls from Jail

On March 26, 2019 (the day after he was arrested at the La Quinta), Stennis was charged in state court with domestic assault by strangulation.  He was apparently unable to post bail, so he remained in custody.  Once he was able to make contact with A.R., Stennis began calling her from jail almost every day—sometimes more than once a day.  The jury heard recordings or read transcripts of many of those calls.  During some

of the calls, Stennis displayed awareness of the investigations into his conduct, as well
as awareness of the potential charges and penalties he faced.

For example, on May 28, 2019, Stennis told A.R. that he had received "some
paperwork that say[s] Homeland Security on it." ECF No. 180 at 194. He further
remarked: "I guess St. Louis and Ohio are still doing an investigation because they sent
me the paperwork, man. . . . So that's how I know I am under investigation. You know
what I mean? But I ain't charged yet for that." *Id.* He recognized that "Homeland
Security is the Feds." *Id.* After A.R. asked Stennis "what do they have to prove?," he
responded that he did not know but expressed his belief that if he "beat this . . .
domestic violence," then he would "beat the promotion of prostitution, too" because the
two charges went "hand in hand." *Id.*[7]

Stennis was also anticipating being charged in federal court. He expressed his
understanding of federal jurisdiction on the May 28, 2019, call with A.R.:

> I guess the fuckin' prosecutor and the promoting
> prostitution shit because . . . shorty [A.J.] told them that I
> took her across state lines, so that's no longer a state case.
> Anything you do illegal across state lines . . . is federal, is a
> federal charge. If I take a weed from Minnesota—I mean

---

[7]At the time of this conversation, Stennis had been charged only with domestic
violence; he would not be charged with promoting prostitution until September 25,
2019, and he was not indicted by a federal grand jury until January 30, 2020. He was
therefore discussing prostitution-related charges that he anticipated, not charges that
had actually been filed.

> Chicago to Missouri, I don't give a fuck if it's a pound of
> weed.  I get it.  That's federal.

*Id.* at 206–07.  Still later, Stennis noted that he would have to register as a sex offender

and potentially serve a steep sentence if convicted of "[h]uman trafficking":

> Yeah, and with this shit—and this shit is all crazy because,
> dude, that means I'd have to register as a sex offender. . . .
> That's what they make people do for them type of charges.
> Human trafficking, you gotta register as a sex offender
> under something—not as a rapist but under something else,
> other category.  But you gotta register like that.  And
> motherfuckers—motherfuckers—motherfuckers get 60—
> 720—that's just—god damn it . . . .

*Id.* at 210.

> In other calls, Stennis asked A.R. to hide evidence related to his acting as her

pimp.  In December 2019, Stennis directed A.R. to change the number on her phone:

> Do you hear me?  I need you to change this number.  It's
> not—this is not a game.  This is—this is—it's not an option.
> . . . But—but soon the court—soon—Indiana or whatever
> state that is court—contact these courts and give them all
> your information; I'm booked.  It ain't gonna matter if you
> show up no more then.

*Id.* at 196.  Stennis called A.R. the next day and again told her to change her phone

number:  "[T]he court's gonna have this number.  Peoria gonna have this number.

Peoria gone give the court these.  They'll hear that number and gonna run that, then I'm

done."  *Id.* at 198.

Through his frequent contact with A.R., Stennis continued to act as her pimp, directing her where to post advertisements, what hotels to use, and what prices to charge. Often Stennis would tell A.R. to send him money (money that she had earned from sex work). When A.R. did not respond as Stennis wanted or when she failed to send him money, Stennis would become angry and occasionally threaten to hurt or even kill A.R. after he got out of jail. On one call, A.R. told Stennis that she did not want to continue doing sex work, and he gave her a "pep talk" to convince her not to stop. ECF No. 181 at 73–74. On another call, Stennis told A.R. to read the rules of being a prostitute from a book titled "Pimpology: The 48 Laws of the Game" by author "Pimpin' Ken."[8] Stennis then chastised A.R. for having a bad attitude and not following Pimpin' Ken's rules completely. Pimpin' Ken's rules include that a prostitute must obey her pimp, must not call the police, and must not run away.

### F.  Prosecution and Conviction

In late 2019, Bloomington Detective Heather Jensen referred Stennis's case for potential federal prosecution. In January 2020, a federal grand jury charged Stennis with one count of sex trafficking of A.R. by force, fraud, or coercion and two counts of violating the Mann Act. ECF No. 14. In October 2020, a superseding indictment was

---

[8] Pimpin' Ken, *Pimpology: The 48 Laws of the Game* (2007).

filed, charging Stennis with an additional count of sex trafficking of A.R. by force, fraud, or coercion and one count of obstructing the enforcement of § 1591.  ECF No. 62.

At trial, Stennis testified in his own defense and conceded guilt on the Mann Act counts.  Stennis admitted that he was a pimp and that he had promoted A.R. and A.J. as prostitutes.  He even admitted to hitting A.R. in the bathroom at the La Quinta and threatening her with death over the phone while he was in jail.  ECF No. 181 at 181, 214–15.  Stennis's defense, essentially, was that the violence and threats of violence stemmed from a dysfunctional romantic relationship; he insisted that he had not used violence, threats of violence, or other coercion to make A.R. engage in prostitution.  *See id.* at 194, 204–05.  He further contended that he had no idea that he was being investigated for sex trafficking by force, fraud, or coercion; he thought he was being investigated only for domestic violence and promoting prostitution.  *Id.* at 186.

At the close of the government's case-in-chief, Stennis moved for a judgment of acquittal under Fed. R. Crim. P. 29.  ECF No. 181 at 132.  The Court reserved ruling on that motion until after the jury returned its verdict.  *Id.*  After presenting his defense, Stennis renewed his oral Rule 29 motion.  *Id.* at 233.  The Court again reserved ruling on the motion (except that the Court ruled that Stennis was not entitled to relief as to Count 2 on the ground of improper venue).  ECF No. 182 at 6–8.  After the jury returned

a guilty verdict, the Court requested briefing on the Rule 29 motion as it pertained to

Count 5 (the obstruction count).  *Id.* at 90.

At Stennis's sentencing hearing, the Court ruled from the bench on Stennis's

Rule 29 motion.  Specifically, the Court said:

> Mr. Stennis moved under Rule 29 for a judgment of
> acquittal.  Having reviewed the trial transcript carefully and
> having conducted additional legal research, I deny the
> Rule 29 motion as to all counts, including Count 5, and I will
> explain the basis of my ruling in a written order that I hope
> to issue in the near future.

ECF No. 216 at 4.  This memorandum provides the explanation promised by the Court.

## II.  ANALYSIS

### A.  Legal Standard

On a defendant's motion, the Court "must enter a judgment of acquittal of any

offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim.

P. 29(a).  In ruling on a Rule 29 motion, the Court must view the evidence in the light

most favorable to the government, resolve any evidentiary conflicts in the government's

favor, and draw all reasonable inferences in favor of the verdict.  *United States v. Jenkins*,

758 F.3d 1046, 1049 (8th Cir. 2014).  The Court may grant the motion only if no

reasonable jury could have convicted the defendant.  *Id.*  Because Stennis moved for a

judgment of acquittal at the close of the government's case and the Court reserved its

ruling at that time, the Court must consider only the government's evidence in ruling on his motion.  Fed. R. Crim. P. 29(b).

### B.  Count 5: Obstructing the Enforcement of § 1591

The jury convicted Stennis of violating 18 U.S.C. § 1591(d) by obstructing the government's investigation of him for sex trafficking.  Section 1591(d) provides that "[w]hoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of [18 U.S.C. § 1591], shall be fined under this title, imprisoned for a term not to exceed 25 years, or both."  18 U.S.C. § 1591(d).  Notably, § 1591(d) does not contain an express *mens rea* element.  When Congress is silent as to mental state, the general rule is that a defendant cannot be convicted unless he "know[s] the facts that make his conduct illegal."  *See Staples v. United States*, 511 U.S. 600, 605–07, 616–19 (1994); *see also United States v. White*, 863 F.3d 784, 787 (8th Cir. 2017) (en banc).  Consistent with that rule, the few courts that have interpreted § 1591(d) have found that the statute includes a knowledge requirement.  *See United States v. Farah*, 766 F.3d 599, 613 (6th Cir. 2014) ("Here, [§ 1591(d)] is silent, thus knowingly is the appropriate *mens rea*."); *United States v. McCray*, No. 1:15-cr-212-WSD, 2017 WL 3141172, at *14 (N.D. Ga. July 25, 2017) ("To convict a defendant of [violating § 1591(d)], the Government must prove beyond a reasonable doubt that the defendant knowingly obstructed or attempted to obstruct the enforcement of Section 1591 . . . .").

"It is for [the Court], through interpretation of the statute, to define the *mens rea*
required for a conviction"—here, to determine *which* facts the government must prove
Stennis knew.  *Staples*, 511 U.S. at 612 n.6.  Without the benefit of much case law on the
issue, the Court was required to draft the jury instructions for Count 5 essentially from
scratch.  After careful consideration and extended discussion with the parties, *see* ECF
No. 181 at 18–28, the Court instructed the jury that, to convict Stennis on Count 5, the
jury had to find beyond a reasonable doubt that Stennis (1) "was being investigated or
prosecuted for sex trafficking by force, fraud, or coercion"; (2) "knew of that
investigation or prosecution"; and (3) "voluntarily and intentionally acted in some way
to obstruct, attempt to obstruct, interfere with, or prevent that investigation or
prosecution."  ECF No. 153 at 11.[9]

The Court further instructed the jury that it was *not* necessary for the
government to prove: (1) that Stennis knew that a federal statute made it illegal to
engage in sex trafficking by force, fraud, or coercion; (2) that Stennis was in fact guilty
of sex trafficking by force, fraud, or coercion; or (3) that Stennis was aware of the *federal*
nature of the investigation of him for sex trafficking by force, fraud, or coercion.  *Id.*; *see*

_____

[9]The Court's instruction that an investigation must have existed and that Stennis
must have known of it might have been too narrow.  Because the statute also proscribes
*attempted* obstruction, a defendant's *belief* in the existence of an investigation might be
sufficient, even if the defendant was not in fact being investigated.  If the Court erred,
however, that error obviously could not have harmed Stennis.

18 U.S.C. § 1591(d) (prohibiting "*in any way* interfer[ing] with or prevent[ing] the

enforcement of" § 1591 (emphasis added)); *see also United States v. Delay*, 788 F. App'x

551, 552 (9th Cir. 2019) (reserving judgment on whether government must prove that

defendant knew he would interfere with a *federal* investigation).

After a thorough review of the transcript of the trial and the exhibits admitted

into evidence at the trial, the Court finds that a reasonable jury could have found that

the government established all of the elements of a § 1591(d) offense beyond a

reasonable doubt:

*First*, Stennis was being investigated for sex trafficking by force, fraud, or

coercion.  One investigation started on February 5, 2019, after A.R. used Stennis's phone

to send a text message to her mother.  A.R.'s mother relayed that text message to the

police, and the police then arrested Stennis after directing the bus driver to pull over.

The alarming nature of A.R.'s text, her mother's response, and the fact that Stennis was

holding A.R.'s identification card at the time of his arrest gave the police reason to

believe that Stennis was coercing A.R.

Of course, Stennis was engaged in the sex trafficking of A.R. at that point, as he

more or less told the police, and as the police confirmed by finding the online

advertisements listing Stennis's phone number.  It is possible that even though the

police had reason to believe that Stennis was A.R.'s pimp and that Stennis was holding

her against her will, the police may not have immediately known *why* Stennis was holding her. But that does not matter; the police had begun to investigate the conduct that was ultimately determined to be sex trafficking by force, fraud, or coercion. That was sufficient to bring the investigation within the ambit of § 1591(d).

A second investigation of Stennis for sex trafficking by force, fraud, or coercion began after police were called to the La Quinta. The police were dispatched to the hotel because a guest had reported sounds of yelling and someone being thrown against a wall and because a 911 operator had received a call from the location of the hotel with no voice but with sounds of a struggle. Once Officer Mast arrived, A.R. told him that she was a prostitute and Stennis was her pimp, that she no longer wanted to do sex work for Stennis, and that Stennis had started beating her shortly after she informed him of that fact. A.R. bore fresh injuries (including a new black eye), and the room contained evidence of a violent struggle, corroborating A.R.'s account. Thus, the investigation of Stennis by the Bloomington police was from the outset an investigation into whether he had engaged in sex trafficking by force, fraud, or coercion.

*Second*, Stennis knew of these investigations. There is little dispute that he knew that he was being investigated for *something*. He was first arrested shortly after A.R. sent the text from the Megabus, and he was arrested a second time shortly after he assaulted A.R. at the La Quinta.

A reasonable jury could have found that Stennis also knew that among the crimes for which he was being investigated was the crime of sex trafficking by force, fraud, or coercion.  As to the Minnesota investigation:  Stennis knew that he had been acting as A.R.'s pimp, he knew that A.R. did not want to keep doing sex work, he knew that he had assaulted A.R. at the La Quinta after she said as much, and he knew that the Bloomington police were investigating him for what he had done at the La Quinta.  The jury could easily find that Stennis knew that he was being investigated by the Bloomington police for suspected sex trafficking by force, fraud, or coercion.

As to the Westlake investigation:  Stennis again knew that he had been traveling with A.R. and acting as her pimp, and he knew that he had been found holding A.R.'s identification card.  It is possible that Stennis did not see A.R.'s text message to her mother from his cell phone, as that text message was deleted from his phone (possibly by A.R. after sending it).  ECF No. 179 at 116–17.  But a reasonable jury could have found that Stennis must have known that the bus suddenly pulled over and police came onto the bus to arrest him because A.R. had communicated to someone that she was being held against her will.

Stennis knew that these investigations were ongoing when he engaged in the obstructive conduct.  Just before his arrest in Bloomington, he knew that he was under investigation for assaulting A.R. in relation to her sex work for him; that is presumably

the reason why he told A.J. to take his phone and delete information connected to his activities as a pimp. Stennis never had any reason to believe that the Bloomington investigation had terminated; to the contrary, he continued to be held in custody in Minnesota. Stennis likewise had no reason to believe that the Westlake investigation had concluded. As Stennis himself said in a May 2019 jail call with A.R., he received paperwork from the Department of Homeland Security informing him of its investigation into his involvement in human trafficking. Any obstructive activity Stennis undertook from that point onward (if not earlier) would have been directed at both the federal human-trafficking investigation and the Bloomington investigation (which did not become federal until late 2019).

*Third*, Stennis voluntarily and intentionally acted to obstruct, interfere with, or prevent those investigations. Shortly before Stennis was taken into custody at the La Quinta, he gave A.J. his phone and told her to delete everything related to his activities as a pimp, to change the phone number, and to lie to the police about the phone and about her work as a prostitute. The inference that Stennis was trying to impede a sex-trafficking investigation is strengthened by the kind of lie that Stennis asked A.J. to tell (viz., that Stennis and A.R. had been in a fight about not wanting to have a threesome). That lie would not be a defense against a domestic-assault charge, but it would be a defense against a § 1591(a) charge.

Further examples of Stennis's obstructive behavior abound: telling A.J. to dissuade A.R. from pressing charges against him; insisting that A.R. follow his rules, including not talking to the police and not acting to Stennis's detriment; threatening violence against A.R. after she said or did something to upset him; and instructing A.R. to change her phone number so that law-enforcement officers could not find her. *See United States v. Brinson*, 772 F.3d 1314, 1327–28 (10th Cir. 2014) (holding that calling subpoenaed witness from jail and encouraging her not to testify before grand jury was sufficient evidence to support § 1591(d) conviction). Stennis's goal with respect to all of these acts—sometimes expressly stated during jail calls and other times reasonably inferable from the evidence—was to hinder the investigations of his conduct.

In sum, the evidence presented by the government in its case-in-chief was sufficient to allow a reasonable jury to find that the government had established all of the elements of a § 1591(d) offense beyond a reasonable doubt.

### C.  The Remaining Counts

Little need be said about Counts 3 and 4, the Mann Act violations. There was overwhelming evidence that Stennis transported A.R. and A.J. from Minnesota to North Dakota to engage in prostitution. In fact, Stennis readily conceded guilt on these counts at trial. ECF No. 179 at 32; ECF No. 181 at 191; ECF No. 182 at 34–35.

-21-

There was also sufficient evidence for a jury to convict Stennis on Counts 1 and 2, the two sex-trafficking counts.  With respect to Count 1—which related to the period from January 2019 (when Stennis met A.R.) to March 2019 (when Stennis was arrested for assaulting A.R.)—the jury could reasonably have concluded that Stennis recruited, enticed, transported, provided, obtained, advertised, or maintained A.R. while knowing that he would use some combination of force, threats of force, or coercion to cause A.R. to engage in sex work.

Count 2 related to the period from May 2019 to November 2019, during which period Stennis was in custody in Minnesota.  Even though Stennis was in jail, he continued to act as A.R.'s pimp.  Stennis managed A.R.'s sex work through jail calls, telling her where to post advertisements, which hotels to use, and how much to charge. He badgered A.R. into rereading his rules—including rules requiring A.R. to obey him, never call the police, and never run away—and then chastised A.R. for her lack of commitment to the rules.  Stennis repeatedly ordered A.R. to put money on his jail account.  And when A.R. did not do what Stennis wanted—especially when she failed to send him money—Stennis would threaten to hurt or kill her.  A jury could reasonably conclude that Stennis, although incarcerated, coerced A.R. into prostitution through threats of serious harm.

Last, Stennis argued that venue did not lie in the District of Minnesota for either of the sex-trafficking counts.  At trial, the Court denied the Rule 29 motion on this ground with respect to Count 2 and reserved judgment on that ground with respect to Count 1, later denying the motion as to Count 1 at Stennis's sentencing hearing.  Venue for a federal crime lies in any district in which that offense "began, continued, or was completed."  *United States v. Banks*, 706 F.3d 901, 904 (8th Cir. 2013); *see also* 18 U.S.C. § 3237(a) ("Any offense involving . . . transportation in interstate . . . commerce . . . is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce . . . moves.").  The events in Minot and Bloomington are sufficient to show that Stennis moved A.R. in interstate commerce into the District of Minnesota during the time period charged in Count 1 in order to continue forcing or coercing her into sex work.  Thus, under § 3237(a), a reasonable jury could find that venue for Count 1 lay in this District.

In sum, a reasonable jury could conclude that the government proved all elements of all counts beyond a reasonable doubt.  The Court therefore denied Stennis's Rule 29 motion in all respects.

Dated:  June 27, 2022

Patrick J. Schiltz
United States District Judge

-23-